**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**


| | | |
|---|---|---|
| **D.F.,** *et al.* | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 18-93** |
| | * | |
| **JACK R. SMITH**, *et al.* | * | |
| | * | |
| Defendants. | * | |


## MEMORANDUM OPINION

D.F., a minor by, his parents and next friends M.F. and S.F. (collectively "D.F.'s parents" or "Parents"), sues Jack R. Smith, Superintendent of Montgomery County Public Schools, and the Montgomery County Board of Education ("Smith" or "MCPS"), pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). D.F.'s parents contend that MCPS denied D.F. a free appropriate public education ("FAPE") by recommending him for placement in a specialized public school program instead of a private special education day school. D.F.'s parents seek reimbursement for the costs of educating D.F. at the private school, which his parents selected unilaterally. D.F.'s parents dispute the findings of an Administrative Law Judge that they were not entitled to reimbursement because they had not established that the public school special education program recommended by MCPS was not reasonably calculated to provide D.F. with a FAPE in the least restrictive environment.

The parties have filed cross-motions for summary judgment. For the reasons that follow, the Court will **DENY** D.F.'s Motion and **GRANT** Smith's Cross-Motion.

**I.**

When D.F. was approximately eighteen months old, his parents noticed that he struggled with language and social skills and did not respond when spoken to. Subsequent pediatric evaluations led to a diagnosis of Pervasive Developmental Disorder and a strong suggestion that D.F. was on the Autism spectrum. After moving to Montgomery County in January 2012, when D.F. was two years old and preparing to enter preschool, D.F.'s parents contacted the Montgomery County Infants and Toddlers Program ("MCTIP"), which recommended that D.F. begin receiving speech/language therapy, occupational therapy, and physical therapy. D.F. began these treatments in February 2012. In July 2012, MCTIP reassessed D.F. and recommended that he be found eligible for special education services. D.F. began attending MCPS preschool for the 2012-13 school year, during which time he attended the Preschool Education Program Intensive Needs Class ("PEP-INC") at Strawberry Knolls Elementary School ("Strawberry Knolls"). D.F. attended PEP-INC for three hours daily, five days a week, where he received specialized instruction, speech/language therapy, and occupational therapy, while also continuing to receive private behavioral, speech, and physical therapy outside of school. D.F. attended PEP-INC at Strawberry Knolls for the 2012-13 school year, then attended PEP-INC at Thurgood Marshall Elementary School ("Thurgood Marshall") for the 2013-14 and 2014-15 school years.

During the summer of 2014, Dr. Daniel Shapiro, a developmental pediatrician, evaluated D.F. with respect to his continued delayed development. Dr. Shapiro diagnosed D.F. with Global Developmental Delays, such as severe Mixed Expressive-Receptive Language Disorder, Developmental Coordination Disorder, Uneven Sensory Profile, and Executive Dysfunction with possible ADHD. Secondary to this diagnosis, he determined that D.F. had a Disorder of Social Communication (Autism).

In October 2014, D.F.'s parents met with Montgomery County Public Schools ("MCPS") personnel, who concluded that additional information was required to update his disability classification. MCPS completed a psychological examination of D.F. in November 2014 and interviewed his teacher at PEP-INC, who reported that D.F. demonstrated significant communication difficulties, avoided challenging activities, became upset if his ritualized behaviors were disturbed, and on some days in school seemed to be "off in his own world." MCPS found D.F. eligible for services as a student with Autism in December 2014.

In March 2015, Dr. Lisi Levisohn, a pediatric neuropsychologist, evaluated D.F. at the request of D.F.'s parents and recommended that his educational instruction include specialized one-to-one support from a trained professional in a program with speech/language therapy, occupational therapy, and social-relating interventions integrated throughout his school day. Based on Dr. Levisohn's report, D.F.'s parents identified the Katherine Thomas School ("KTS"), a private special education day school, as their preferred school for D.F. After applying to KTS, D.F. was accepted there on May 7, 2015.

On June 11, 2015, D.F.'s parents, their educational consultant, Rich Weinfeld, and Dr. Levisohn attended a meeting with MCPS officials to discuss D.F.'s upcoming Kindergarten placement and his Individualized Education Program ("IEP"). MCPS proposed placing D.F. at the School-Based Learning Center for Students with Autism at Jones Lane Elementary School ("Jones Lane") for the 2015-16 school year. D.F.'s parents did not believe that he had made developmental progress while attending PEP-INC, and they requested that D.F. be placed in a school environment where he could receive instruction from a one-to-one aide dedicated to his development throughout the school day. Because Jones Lane did not offer one-to-one instruction, D.F.'s parents enrolled him unilaterally at KTS for the 2015-16 school year.

D.F.'s parents contacted MCPS through their counsel on March 7, 2016 to request a meeting to discuss updating D.F.'s IEP for the 2016-17 school year based on his experiences at KTS. In May, before the IEP meeting, an MCPS investigator observed D.F. at KTS, with the consent of KTS personnel. After the observation, D.F.'s parents allege that MCPS did not provide them with the investigator's notes or report, nor did MCPS agree to their request to postpone the IEP meeting. Because of the scheduling dispute, D.F.'s parents ultimately did not attend the IEP meeting on May 27, 2016.

After resolving the scheduling dispute, D.F.'s parents and MCPS officials held another meeting to discuss D.F.'s IEP on July 28, 2016. One of D.F.'s teachers at KTS also attended this meeting, at which D.F.'s parents and the KTS teacher emphasized D.F.'s need for one-to-one support during the school day. MCPS proposed an IEP for the 2016-17 school year that provided that D.F. would receive all instruction during the school day in environments with a student-teacher ratio of 2:1 or smaller. Both D.F.'s parents and MCPS officials stipulated to refer to the 2:1 student-teacher ratio as a "dyad." D.F.'s 2016-17 IEP also continued to recommend placement at Jones Lane.

On August 5, 2016, counsel for D.F.'s parents informed MCPS in writing that they did not believe D.F.'s 2016-17 IEP would provide him with a FAPE and requested that MCPS fund D.F.'s placement at KTS for the 2016-17 school year. MCPS responded by letter on August 9, 2016, declining to place and fund D.F. at KTS and asserting that an IEP placing D.F. at Jones Lane would provide him a FAPE.

D.F. attended KTS for the 2016-17 school year. During that school year, D.F.'s parents retained a new educational consultant, Amy Mounce. Ms. Mounce observed D.F. at KTS on October 13, 2016. On October 18, 2016, D.F.'s parents and Ms. Mounce visited Jones Lane to

determine if it would be a suitable placement for D.F. Based on her observations, Ms. Mounce drafted a report, dated November 15, 2016, recommending that D.F. receive instruction in a 1:1 student-teacher ratio and that he continue attending KTS.

On March 31, 2017, D.F.'s parents and MCPS officials met to develop D.F.'s IEP for the 2017-18 school year. MCPS proposed that D.F.'s IEP include the same student-teacher ratio and school placement as in D.F.'s IEP for the 2016-17 school year. D.F.'s parents disagreed, and on August 17, 2017, they informed MCPS in writing that D.F. would attend KTS for the 2017-18 school year. On August 30, 2017, MCPS again denied D.F.'s parents' request for reimbursement for expenses incurred as a result of enrolling D.F. at KTS.

On April 24, 2017, D.F.'s parents filed a Due Process Complaint with the Maryland Office of Administrative Hearings ("OAH"), alleging that MCPS had failed to provide D.F. with a FAPE and seeking reimbursement for enrolling D.F. unilaterally at KTS. The Complaint also requested a hearing to review D.F.'s IEP, pursuant to IDEA. 20 U.S.C. § 1415(f)(1)(A). A hearing at which both parties presented exhibits and witness testimony was held from September 11–15, 2017 before Deborah S. Richardson, an OAH Administrative Law Judge ("ALJ" or "ALJ Richardson"). At the hearing, D.F.'s parents presented testimony from six witnesses, including themselves, Dr. Levisohn, and Ms. Mounce. D.F.'s parents also presented testimony from JoAnn Pellegrino, a private speech-language therapist who had worked with D.F. for approximately two hours per week since June 2015, and Shawna Page, the senior speech-language pathologist at KTS who had interacted with D.F. every day during the period of his enrollment at KTS. ALJ Richardson recognized Dr. Levisohn as an expert in developmental neuropsychology, Ms. Mounce as an expert in special education, Ms. Pellegrino as an expert in speech-language pathology, and Ms. Page as an expert in speech-language pathology with a focus in early childhood development.

MCPS presented testimony from four witnesses: Melissa Diggs, Faith Fischel, Ravinder Basi, and Christine Shrake. All MCPS witnesses were MCPS employees with professional experience in treating students with autism. Three of them had extensive classroom experience with D.F. Ms. Fischel, a speech-language pathologist, supervised the PEP-INC classroom at Thurgood Marshall that D.F. attended for the 2014-15 school year. Ms. Basi, also a speech-language pathologist, worked with D.F. approximately twice a week for two years when he was enrolled in the PEP-INC and in Basic Concepts, a summer education program that D.F. also attended. Ms. Shrake, an occupational therapist, worked with D.F. approximately three times per week from September 2013 until June 2015, when he attended the PEP-INC at Thurgood Marshall. Ms. Diggs observed D.F. at KTS on May 20, 2016, consulted on all three of the meetings of his IEP team, and supervised the program for autistic students at Jones Lane. The ALJ recognized Ms. Diggs as an expert in special education with a focus in autism, Ms. Fischel as an expert in speech-language pathology with a focus on early childhood disabilities and autism, Ms. Basi as an expert in speech-language pathology with a focus on early childhood education and autism, and Ms. Shrake as an expert in occupational therapy with a focus on preschool early childhood education and autism.

On October 13, 2017, ALJ Richardson—based on the witness testimony and other evidence presented at the administrative hearing—found that MCPS had developed an appropriate IEP reasonably calculated to provide D.F. with a FAPE.[1]

D.F.'s parents filed the present action on January 10, 2018, naming the Montgomery County Board of Education and Jack R. Smith, superintendent of MCPS, as defendants. Defendants filed their Answer on February 2, 2018. The parties agreed to a briefing schedule for

---

[1] Citations to ALJ Richardson's decision are noted throughout as "ALJ Decision at __."

filing Motions for Summary Judgment that they amended twice during the spring and summer of 2018. Plaintiffs filed their Motion for Summary Judgment on August 10, 2018. Defendants filed their Cross-Motion for Summary Judgement and Response in Opposition to Plaintiffs' Motion on September 21, 2018. Plaintiffs filed their Opposition to Defendants' Cross-Motion on October 19, 2018. Defendants filed their Reply on November 13, 2018. On December 10, 2018, the Court held a hearing on the Motions during which both parties presented their arguments.

## II.

Under IDEA, students with disabilities are assured a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). The vehicle for providing a student with a FAPE is the Individualized Education Plan ("IEP"), which is developed by an IEP team consisting of school system administrators and educators, the student's parents, and experts in special education. 20 U.S.C. § 1414(d)(1)(B). The IEP must be tailored to the specific needs of the student and include (1) the student's "present levels of academic achievement and functional performance," (2) a list of "measurable annual goals" for the student, (3) a system for measuring the student's progress toward his or her annual goals, (4) a "statement of the special education and related services and supplementary aids and services" to be provided to the student, and (5) an "explanation of the extent . . . to which the [student] will not participate with nondisabled children" in the school environment. 20 U.S.C. § 1414(d)(1)(A). IDEA requires that students be placed in the "least restrictive environment," such that they are "educated with children who are not disabled" to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5). If a student's parents dispute the sufficiency of the IEP proposed for their child, they may file a complaint and seek a due process hearing before an impartial administrative officer. 20 U.S.C. § 1415(b)(6), (f). The parents are

entitled to file an action in federal district court if they are "aggrieved by the findings and decision" of the administrative hearing officer. 20 U.S.C. § 1415(i)(2).

The goal of IDEA is that each student should receive an education appropriate to his or her unique needs, although this does not necessarily mean entitlement to an education that maximizes individual potential. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 199 (1982). If the student's IEP creates an educational program that is "reasonably calculated to enable the child to receive educational benefits," then the IEP satisfies the school district's obligation to provide a FAPE. *Id.* at 207. Moreover, IDEA distinguishes between the child's educational needs, as to which the Act insures funding, and the child's medical needs, which are ordinarily the financial responsibility of the child's parents. *See Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990) ("[O]ur analysis must focus on whether [the child's] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that [are] necessar[ily] quite apart from the learning process.").

An IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). A "reasonably calculated" IEP "reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials." *Id.* Crafting an IEP is a fact-intensive inquiry into a student's past performance that incorporates "the expertise of school officials" and "the input of the child's parents or guardians." *Id.* The key question is "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* (emphasis in original).

The "progress" that an IEP envisions for a student must be greater than "merely more than *de minimis*" improvement from year to year. *Endrew F.*, 137 S.Ct. at 1001. However, there is no

bright-line rule on what constitutes "appropriate" progress, and courts should determine appropriateness on a case by case basis without "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *Endrew F.*, 137 S. Ct. at 1001 (quoting *Rowley*, 458 U.S. at 206) (internal quotation marks omitted). School officials must be able to offer a "cogent and responsive explanation" for their decisions in developing an IEP "reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S.Ct. at 1002.

Parents may recover reimbursement from the public school system for unilaterally placing their child in a private school only if they demonstrate (1) the proposed IEP would not have provided the student with a FAPE, and (2) the education services offered by the private school are appropriate for the child's needs. *See Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985). Thus, the ultimate issue in cases where parents seek reimbursement for unilaterally enrolling their child in a private school is whether the public school district has developed an IEP that would provide the student with a FAPE—not whether the private school is more or equally appropriate for the student.

### III.

In *Rowley*, the Supreme Court established that in reviewing administrative decisions in IDEA cases, the district court must make an independent decision based on a preponderance of the evidence while giving due weight to the state administrative proceedings. 458 U.S. at 206. In *Doyle v. Arlington County School Board,* the Fourth Circuit elaborated on the "due weight" requirement. 953 F.2d 100, 105 (4th Cir. 1992). Due weight must be accorded to the findings of fact of the hearing officer, which are entitled to a presumption of *prima facie* correctness, while the district court, if it is not going to follow those findings, must explain why. *Id.* The district

court may consider the entire record developed below as well as any additional evidence presented in the district court itself.  20 U.S.C. § 1415(i)(2)(C).

In reviewing cross-motions for summary judgment in an IDEA action, the reviewing court is obliged to conduct a modified *de novo* review of the administrative record, giving due weight to the underlying administrative proceedings.  *See MM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (internal quotation marks omitted).  However, the reviewing court cannot "substitute [its] own notions of sound educational policy for those of local school authorities." *Id.* School district decisions, if made in a procedurally sound manner, are entitled to significant deference:

> [O]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the judgment of education professionals. Neither the district court nor this court should disturb an IEP simply because we disagree with its content. Rather, we must defer to educators' decisions as long as an IEP provided the child the basic floor of opportunity that access to special education and related services provides.

*Tice v. Botetourt Cty. Sch. Bd.*, 908 F.2d, 1200, 1207 (4th Cir. 1990) (internal quotation marks omitted).  Thus, when an official conducting an administrative hearing makes findings of fact "in a regular manner and with evidentiary support," those findings "are considered *prima facie* correct."  *Doyle*, 953 F.2d at 105.

## IV.

D.F. and his parents argue that ALJ Richardson's Decision is both procedurally and substantively deficient.  They contend that (1) ALJ Richardson's factual findings and witness credibility determinations are not entitled to deference, (2) ALJ Richardson improperly failed to consider evidence of D.F.'s performance at KTS and dismissed such evidence as "irrelevant," (3) the IEPs developed by MCPS for the 2015-16, 2016-17, and 2017-18 school years failed to provide D.F. with a FAPE, and (4) MCPS is required to reimburse D.F.'s parents for the costs of enrolling

D.F. at KTS during those school years.  Smith argues that the Court should defer to ALJ Richardson's judgment but regardless, they say, the IEPs did provide D.F. with a FAPE, relieving Smith and MCPS of their obligation to reimburse D.F.'s parents for unilaterally placing D.F. at KTS.

The Court agrees with Defendants.

## A.

In deciding whether to defer to the judgment of a state administrative officer, a reviewing court should "examine the way in which the state administrative authorities . . . arrived at their administrative decision and the methods employed." *Doyle*, 953 F.2d at 105.  Factual findings made by an administrative officer are "entitled to a presumption of correctness, so long as the findings were 'regularly made.'" *Cty. Sch. Bd. of Henrico Cty., Va. v. Z.P.*, 399 F.3d 298, 305 (4th Cir. 2005) (quoting *Doyle*, 953 F.2d at 105).  However, the reviewing court should not defer to factual findings "reached through a process . . . far from the accepted norm of a fact-finding process." *Id.* (internal quotation marks omitted).  Thus, in IDEA actions, administrative officer decisions are entitled to significant deference, particularly if "the hearing officer conducted a proper hearing, allow[ed] the parents and the School Board to present evidence and make arguments, and . . . by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating [the] responsibility to decide the case." *J.P. v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008).

In the present case, there is no indication that ALJ Richardson deviated in any way from the "accepted norm of a fact-finding process."  After a five-day hearing, during which the parties collectively presented testimony from ten witnesses and over 100 exhibits, ALJ Richardson issued an eighty-page opinion summarizing the parties' arguments and testimony, as well as outlining the

rationale in support of her conclusion that MCPS had created an IEP that offered D.F. a FAPE. This process is consistent with other IDEA cases in which the Fourth Circuit has affirmed ALJ decisions. *See, e.g.*, *J.P.*, 516 F.3d at 262 (affirming a twenty-five-page ALJ decision that "included summaries of the witnesses' testimony, an outline of the relevant legal standards, and the hearing officer's findings of fact and legal conclusions.").

Additionally, contrary to the Parents' arguments that the ALJ improperly discredited their witnesses and overly credited MCPS witnesses, ALJ Richardson fairly determined the credibility of MCPS witnesses during the hearing. "[A]n IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments," *S.A. v. Weast*, 898 F. Supp. 2d 869, 877 (D. Md. 2012) (citing *J.P.*, 516 F.3d at 261; *Z.P.* 399 F.3d at 306), and a hearing officer's implicit determinations regarding witness credibility are entitled to the same deference as explicit determinations. *S.A.*, 898 F. Supp. 2d at 877 (citing *Z.P.*, 399 F.3d at 307).

In her Decision, ALJ Richardson noted that D.F.'s parents presented the testimony of expert witnesses in developmental psychology, speech-language pathology, and special education, as well as testimony from D.F.'s parents themselves about their own obviously personal involvement in nurturing D.F. and developing his educational plans. ALJ Decision at 67–69. The Decision evaluated in detail the backgrounds, expertise, and experience with D.F. of all the witnesses offered at the hearing. *Id.* at 49–57, 59–67. D.F.'s parents' witnesses were undoubtedly qualified to testify regarding D.F.'s performance at home, in individual therapy sessions, or in his classroom at KTS. However, as noted by the ALJ, the MCPS hearing witnesses had more frequently interacted with D.F. in the PEP-INC programs at Strawberry Knolls and Thurgood Marshall, such that the ALJ was led to conclude that the combination of in-person contact and special education expertise offered by the MCPS witnesses was more persuasive. *See id.* at 69.

The MCPS witness testimony went directly to the primary issues before the ALJ: whether the IEPs that proposed placing D.F. at Jones Lane and in educational environments with student-teacher ratios greater than 1:1 would have provided him with a FAPE. When parents' witnesses in an IDEA administrative hearing have had less experience interacting with a student in public school classrooms and programs than the school system's witnesses, and the proposed IEP at issue recommends placing the student in another public school in the same jurisdiction, it is valid for the hearing officer to find the school system's witnesses more credible. *See, e.g.*, *M.M. v. Foose*, 165 F. Supp. 3d 365, 378–79 (D. Md. 2015).[2]

As ALJ Richardson noted, this case "presents a classic problem of opposing expert witnesses." ALJ Decision at 67. Accordingly, it was reasonable for ALJ Richardson to have considered the evidence presented by opposing parties and to ultimately decide that one party's witnesses presented more compelling testimony. Given the strong presumption of reviewing courts to defer to both explicit and implicit determinations of witness credibility made by administrative hearing officers, the Court finds no reason to disturb ALJ Richardson's judgments about the credibility of the parties' hearing witnesses.

---

[2] The situation described in *Foose* parallels the present case. In *Foose*, the parents had initially enrolled their child in the "Cedar Lane School," a special education program offered at an elementary school operated by Howard County Public Schools ("HCPS"). 165 F. Supp. 3d at 370–371. Based on the child's performance during three school years at Cedar Lane, HCPS proposed an IEP that recommended placing the child at West Friendship Elementary School, a neighborhood school with an associated special education program, for the following school year. *See id.* at 371–72. The child's parents objected to the proposed placement at West Friendship and ultimately enrolled the child at St. Elizabeth School, a private special education school in Baltimore. *See id.* at 373–74. Subsequently, the parents sought reimbursement from HCPS, but an ALJ concluded that the IEP provided the child with a FAPE and held that HCPS did not have to reimburse the parents. *See id.* at 374–375. The parents appealed the ALJ's decision, partially on the grounds that the ALJ improperly discounted testimony offered by the parents' hearing witnesses, but the district court affirmed the ALJ's witness credibility judgments, noting that the parents' witnesses' testimony had "limited utility" compared to the testimony of HCPS witnesses because the "primary issue before the ALJ concerned whether the proposed placement at West Friendship constituted a FAPE," and the HCPS witnesses had greater experience interacting with the child in HCPS environments. *See id.* at 378–79.

**B.**

D.F.'s parents also argue that the ALJ erred by failing to consider evidence of D.F.'s allegedly improved academic and social performance after enrolling at KTS. *See* ECF No. 13-2 at 18–24. The Parents base this argument primarily on the Supreme Court's recent decision in *Endrew F. v. Douglas County School District*, 137 S.Ct. 988, which they contend "has now put to rest any lingering notion that a student's progress in a private school setting should not be considered when evaluating a school system's IEP." ECF No. 13-2 at 19.

The Court, however, finds the Parents' interpretation of *Endrew F.* overly expansive. While *Endrew F.* notes that the student in that case made "a degree of academic progress that had eluded him in public school" after enrolling in a private school, 137 S.Ct. at 996, it does not prescribe a new rule requiring reviewing courts to consider evidence of post-IEP private school performance to determine whether the IEP provides a FAPE.[3] Instead, *Endrew F.* refines a standard first elucidated in *Rowley*, to the effect that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" in order for a school to "meet its substantive obligation under the IDEA." *Id.* at 999. The Supreme Court expressly refused to establish a "bright-line rule" as to what would constitute "'appropriate'

---

[3] While D.F.'s parents cite cases from within this Circuit to support their argument, in the Court's view the cases only stand for the proposition that a hearing officer *may* consider evidence of a student's private school performance in specific circumstances, not that a hearing officer *shall* consider such evidence. *See Cty. Sch. Bd. of Henrico Cty. v. R.T.*, 433 F. Supp. 3d 657, 675 (E.D. Va. 2006) (holding that "evidence obtained after the IEP is written also *can* be used to assess the inadequacy of the IEP," not that such evidence *must* be used to assess the IEP's inadequacy) (emphasis added); *Justin G. v. Bd. of Educ. Of Montgomery Cty.*, 148 F. Supp. 2d 576, 585 (D. Md. 2001) (permitting the admission of evidence of a student's post-IEP private school performance as proper "additional evidence" under IDEA, 20 U.S.C. § 1415(e)(2), but not mandating that hearing officer consider such evidence). D.F.'s parents also reference *MM v. School District of Greenville County*, 303 F.3d 523 (4th Cir. 2002), in their argument that ALJ Richardson should have considered evidence of D.F.'s progress at KTS to determine whether the proposed IEP offered him a FAPE. *MM* is distinguishable from the present case, however, because the parents in that case had *accepted* the proposed IEP and concurrently enrolled their child in public school and private in-home instruction. 303 F.3d at 528–29. Thus, because the student was proceeding under an IEP, it was proper for the district court to consider evidence of the student's "actual education progress," including her experience with private in-home instruction, in assessing whether the IEP provided a FAPE. *Id.* at 532.

progress," deferring instead to "the application of expertise and the exercise of judgment by school authorities" that were able to offer a "cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id.* at 1001–02. Thus, *Endrew F.* establishes a broad standard for determining whether an IEP provides a FAPE, reasserting the significant deference due to school officials' expertise. It does not require that school officials, let alone a reviewing administrative hearing officer, consider a student's subsequent performance in a private school when forming an IEP.[4] In situations where a student and his or her parents have rejected a proposed IEP, subsequent evidence of that student's performance in private school should not necessarily "retroactively reflect on the propriety of that IEP." *Foose*, 165 F. Supp. 3d at 380 (citing *Schaffer v. Weast*, 554 F.3d 470, 476 (4th Cir. 2009)).

Accordingly, ALJ Richardson was correct in saying "[m]uch of the testimony regarding KTS . . . is irrelevant unless I find that MCPS denied [D.F.] with a FAPE." ALJ Decision at 70–71. While the use the term "irrelevant" may have been somewhat indelicate, it does not change the fact that the ALJ applied the law properly. If an IEP proposed by a public school system provides a FAPE, parents may not seek reimbursement for the expenses of enrolling their child in private school. *Burlington*, 471 U.S. at 370. An IEP provides a FAPE if school officials can offer a "cogent and responsive explanation" that the IEP "is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 137 S.Ct. at 1002. ALJ

---

[4] Despite the contentions of D.F.'s parents, it appears that ALJ Richardson did in fact consider evidence of D.F.'s performance at KTS. The ALJ Decision contains factual findings with respect to D.F.'s academic performance and disciplinary record at KTS during the 2015-16 and 2016-17 school years. ALJ Decision at 34, 37–38. MCPS also revised D.F.'s subsequent IEPs based on his performance at KTS, proposing in the IEPs for the 2016-17 and 2017-18 school years that he receive all instruction in environments with a student-teacher ratio of 2:1 or smaller. *See id.* at 36, 39.

Richardson found so here.  Evidence of D.F.'s progress at KTS does not, in the Court's eyes, alter that conclusion.

C.

The Court next considers the arguments of D.F.'s parents that the IEPs developed by MCPS would not have provided D.F. with a FAPE for the 2015-16, 2016-17, and 2017-18 school years. The Parents contend that the IEPs did not provide D.F. with a FAPE because (1) they did not mandate that D.F. receive instruction in educational environments with a student-teacher ratio of 1:1, and (2) they recommended placing D.F. at Jones Lane instead of KTS.  *See* ECF No. 13-2 at 14–18, 37–51.

An IEP constitutes a "statement of measurable annual goals, including academic and functional goals, designed to . . . meet the child's needs that result from the child's disability to enable the child to . . . make progress."  34 C.F.R. § 300.320.  Maryland regulations require that IEP goals be "measurable, academic and functional," "annual," and achievable by the student "within [one academic] year."  Md. Code Regs. § 13A.05.01.09.  A school system must also "address any lack of expected progress in the annual goals.  Md. Code Regs. § 13A.05.01.08.

As explained previously, school district officials should be able to offer a "cogent and responsive explanation" as to why a proposed IEP is "reasonably calculated to enable the child to make progress appropriate in light of his circumstances."  *Endrew F.*, 137 S.Ct. at 1002.  Thus, an IEP is inherently a "prospective judgment by school officials."  *Id.* at 999.  While there is no bright-line rule of what constitutes "appropriate" progress for a student, the IEP must provide opportunities for the student to achieve progress at a level greater than "merely more than *de minimis* progress from year to year."  *Id.* at 1001 (internal quotation marks omitted).

The parties disagree over whether D.F. made sufficient progress while enrolled in the PEP-INC program at Thurgood Marshall during the 2013-14 and 2014-15 school years to justify the IEPs proposed by MCPS for the 2015-16. 2016-17, and 2017-18 school years. The IEPs for the 2013-14 and 2014-15 school years contained goals for D.F. to achieve in the following subject areas: written language, social and emotional development, mathematics, occupational therapy, reading, speech-language, self-help, and classroom behavior. ALJ Decision at 18–26. Each goal had several objectives under them, setting out benchmarks for D.F. to reach in order to achieve the overarching goal. *Id.* Twice per school year, school officials evaluated D.F.'s progress toward reaching the goals and objectives outlined in his IEP by recording one of four progress codes for each goal and objective: achieved; making sufficient progress to meet goal; not making sufficient progress to meet the goal; and not yet introduced. *Id.* at 17, 23. According to these evaluations, for the 2013-14 school year, D.F. was "making sufficient progress to meet" all of the goals in his IEP, although, to be sure, he did not fully achieve any goal within the school year. *Id.* at 18–21. The IEP for the 2014-15 school year largely carried over the goals from the previous school year, and the evaluations for the 2014–15 school year state that D.F. was "making sufficient progress to meet" all goals in his IEP—and that he had "achieved" his goal in mathematics by the end of the school year. *Id.* at 23–26.

While enrolled in the PEP-INC program at Thurgood Marshall for the 2013-14 and 2014-15 school years, D.F. received instruction in classroom environments featuring three adults—one teacher and two para-educators—as well as nine students, including himself. *Id.* at 15. On the basis of D.F.'s performance at Thurgood Marshall, MCPS developed the subsequent IEPs that

recommended placement at Jones Lane and instruction in educational environments with a student-teacher ratio of 3:1 and, later, 2:1.

The Parents, emphasizing that D.F. achieved only one IEP goal during the two school years he was enrolled at Thurgood Marshall, contend that IEPs based on the instruction D.F. received and the academic and social progress he made in PEP-INC would not provide a FAPE because they were not "reasonably calculated" to enable D.F. to make appropriate progress, given his specific circumstances. *See* ECF No. 13-2 at 16–18. However, a student may still make appropriate progress, even if he fails to achieve most of his IEP goals, so long as there is sufficient evidence that the student has made appropriate progress on many of his individualized IEP objectives. *See O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 360–61 (4th Cir. 2015); *Foose*, 165 F. Supp. 3d at 383 (noting that "IEP goals are composed of objectives, and the completion of objectives is itself a form of achievement.").[5] Qualitative evidence, such as testimony from a student's teachers and other educational experts, can be used to show that a student is progressing appropriately under an IEP, and therefore receiving a FAPE. *See O.S.*, 804 F.3d at 360–61 (affirming district court's holding that school board developed an IEP that provided the student with a FAPE, in part because the student's teachers and the school system's educational experts testified that the student made "progress on many of his individualized objectives" in his IEPs for his kindergarten and first grade school years).

In the present case, "[e]very single MCPS witness, *along with the Parents*, testified [that D.F.] made progress while he was [at Thurgood Marshall]" because "[e]very single objective on the IEPs was recorded as 'making sufficient progress to meet goal.'" ALJ Decision at 73

---

[5] Focusing primarily on quantitative goal completion to determine whether a student has achieved appropriate progress under an IEP could incentivize school officials to develop simpler goals that may be easier to achieve but "do not reflect a student's true potential." *See Foose*, 165 F. Supp. 3d at 383 n.29.

(emphasis added).[6]  Although D.F. only achieved one IEP goal in two school years, this alone does not suffice to find that the IEPs did not offer D.F. the opportunity to achieve progress at a level greater than "merely more than *de minimis*." *Endrew F.*, 137 S.Ct. at 1001.  Students with autism may not progress linearly or consistently; the nature of their disability suggests that any academic and social progress they achieve may occur intermittently and be accompanied by periods, as ALJ Richardson noted, where the student does not "necessarily regress" but may "fail[] to generalize a skill."  ALJ Decision at 73.  That D.F. only achieved one IEP goal during the 2013-14 and 2014-15 school years is not necessarily evidence that the IEPs did not provide a FAPE, but it is more likely evidence of the difficulties of educating students with autism.[7]

Consistent with this view, MCPS developed appropriate IEPs that provided D.F. with a FAPE for the 2015-16, 2016-17, and 2017-18 school years.  As the ALJ found, there was sufficient evidence that D.F. made "sufficient progress" toward his IEP goals while attending the PEP-INC program at Thurgood Marshall, even if he did not achieve all of them completely.  In consequence, it is fair to say that D.F. progressed at a level above "merely more than *de minimis*."  In adopting goals, objectives, and characteristics, such as the 3:1 student-teacher ratio, from D.F.'s 2013-14 and 2014-15 IEPs, MCPS developed D.F.'s IEPs for the subsequent school years by drawing on

---

[6] As ALJ Richardson noted, some of D.F.'s progress in the PEP-INC program at Thurgood Marshall could have been due to the private therapy services he received when not in school.  ALJ Decision at 74.  However, an ALJ or a reviewing court is not obliged to find that an IEP is inadequate merely because a student progresses academically while concurrently enrolled in both a public school IEP program and private therapy services.  *See MM*, 303 F.3d at 532 n.13.  In *MM*, the Fourth Circuit reversed the judgment of the district court that a student's IEP for a given year was inadequate.  *See id.* at 533.  Despite evidence that the student in that case had made "actual educational progress" during the school year, the district court had speculated that her progress was due in large part to the private instruction she received in her home after the conclusion of the public school day.  *See id.* at 532 n.13.  The Fourth Circuit reversed, stating that while "some of MM's progress could have been attributable to in-home instruction," and "the evidentiary value of [a student's] actual progress would be diminished if it was substantially attributable to in-home instruction," it had not been demonstrated that the private instruction "in large part" brought about her educational progress.  *See id.*  Without such a showing, the Fourth Circuit refused to find that the student's IEP was inadequate and deferred instead to the judgment of the school officials who developed it.  *See id.* at 533.
[7] Even after enrolling at KTS and receiving instruction in classroom environments with a student-teacher ratio of 1:1, progress reports suggested that D.F. had not "achieved" most of his goals but was instead "progressing" toward achievement.  ALJ Decision at 73–74.

educational environments and programs in which D.F. had already demonstrated an appropriate level of progress. The IEPs were "reasonably calculated" to enable D.F. to make "progress appropriate in light of his circumstances." *Endrew F.*, 137 S.Ct. at 1002.

**2.**

D.F.'s parents also argue that the proposed IEPs for the 2015-16, 2016-17, and 2017-18 school years denied D.F. a FAPE because they recommended placement at Jones Lane Elementary, which the Parents contend could not implement the proposed IEPs for those school years. The Parents were especially concerned that Jones Lane lacked personnel to maintain the student-teacher ratio of 3:1 required in the 2015-16 IEP and the ratio of 2:1 in the 2016-17 and 2017-18 IEPs, let alone the student-teacher ratio of 1:1 that the Parents sought. *See* ECF No. 13-2 at 44–47. D.F.'s parents also allege that, during their observational visit to Jones Lane with their expert, Ms. Mounce, on October 18, 2016, Jones Lane educators left students alone in classrooms unsupervised and were unable to calm one student in the midst of a tantrum. *See id.* at 44–51. As a result of their personal observations, the Parents express concern that Jones Lane is incapable of implementing the proposed IEPs for D.F.

Although D.F.'s parents may be dissatisfied with the level of detail in which the ALJ's Decision addresses their concerns about Jones Lane and the school system's alleged lack of response thereto, administrative officers in IDEA hearings are not required "to explain in detail [their] reasons for accepting the testimony of one witness over that of another." *Z.P.*, 399 F.3d at 306. Even so, the ALJ considered Ms. Mounce's report, noting that it contained an "extensive" accounting of "inappropriate items" that Ms. Mounce observed at Jones Lane. ALJ Decision at 76. The ALJ also acknowledged D.F.'s parents' testimony that, during their observation of Jones Lane, they witnessed two Jones Lane teachers leave a classroom to attend to a student having a

tantrum, allegedly leaving the remaining students unsupervised.  *Id.* at 77.  However, the ALJ

ultimately found that competing evidence presented by the school system, such as discrepancies

in the Parents' witness testimony,[8] countervailing hearing testimony from school system

witnesses,[9] and praise for Jones Lane offered by D.F.'s parents' previous educational consultant,[10]

outweighed the Parents' evidence of insurmountable deficiencies at Jones Lane.

Merely because a hearing officer accepts the evidence of one witness over another is

insufficient justification for a reviewing court to reject a hearing officer's findings.  *See Z.P.*, 399

F.3d at 307.  D.F.'s parents may have presented evidence that they considered Jones Lane to be an

inappropriate placement but, in the ALJ's judgment, the school system successfully rebutted that

argument.[11]  The Court is satisfied that ALJ Richardson considered competing evidence from both

sides at the hearing and issued a Decision based on her explicit and implicit weighing of that

---

[8] For example, ALJ Richardson noted that Ms. Mounce testified during the administrative hearing that she witnessed Jones Lane teachers leave students unsupervised in the classroom during her observation on October 18, 2016, but in the written report of her visit to Jones Lane, Ms. Mounce made no mention of any failure to supervise.  ALJ Decision at 77.

[9] Ms. Diggs, the supervisor of the Jones Lane program, testified that during her weekly observations at Jones Lane, she had not witnessed the lack of supervision and failure to calm upset students that D.F.'s parents testified they had observed during their visit on October 18, 2016.  *See* ALJ Decision at 77–78.  In determining whether Jones Lane was a proper placement for D.F., it was reasonable for the ALJ to value Ms. Diggs's testimony about her frequent observations of Jones Lane over D.F.'s parents' single observation.  Ms. Diggs also testified that Jones Lane personnel could be reassigned to classrooms in which D.F. would receive instruction so that the student-teacher ratio in those classrooms would not exceed 2:1.  *See* ECF No. 17-2 at 30 (citing Hearing Transcript, 9/14/2017 at 811–12); ALJ Decision at 75 ("Ms. Diggs testified unequivocally that MCPS was prepared to implement the IEP that was offered. She explained that she would have to strategically place her staff . . . in order to ensure that academic instruction for [D.F.] occurred in a 2:1 setting.").

[10] Rich Weinfeld, the educational consultant retained by D.F.'s parents prior to Ms. Mounce, wrote in a 2015 report that Jones Lane had "many supports built into [its] program as a whole that are indicative of best practices for students with autism."  *See* ECF No. 17-2 at 42 n.7 (citing Parents' Hearing Exhibit 29 at p. 29.2; Hearing Transcript, 9/11/2017 at p. 198).  ALJ Richardson found this statement compelling.  *See* ALJ Decision at 76 ("But I note that Mr. Weinfeld, the Parents' prior educational advocate, had an extremely positive opinion of Jones Lane in 2015.").

[11] There is no indication that the ALJ blindly deferred to the school system's arguments.  The ALJ, for example, was unimpressed with the school system's argument that Jones Lane was an appropriate placement because D.F. had regressed at KTS, due to the greater frequency at which D.F. attempted to flee classrooms and group settings and demonstrated aggressive behavior at KTS as opposed to PEP-INC.  *See* ALJ Decision at 75 ("There was some argument by MCPS that [D.F.] was regressing in his current placement [at KTS].  I disagree . . . Just because [D.F.] developed some of these behaviors after starting at KTS does not mean that KTS is to blame for their emergence.").

evidence.  There is no evidence that the ALJ departed from accepted procedural norms that would justify rejection of her conclusion that Jones Lane was an appropriate placement for D.F.

Because the Court finds that Defendants developed IEPs that provided D.F. with a FAPE for the school years in question, Defendants are not required to reimburse Plaintiffs for tuition and other related expenses associated with enrolling D.F. at KTS.  *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (holding that parents who unilaterally place their child in a private school "are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act") (emphasis in original).

## V.

While *Endrew F.* refines the standard under which school officials must justify the prescriptions in a student's IEP, it does not overturn the longstanding principle that reviewing courts should generally defer to the expertise of school officials and avoid "captious disputes as to the precise efficacy of different instructional programs."  *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) (citing *Rowley*, 458 U.S. at 202).  The Court sees no reason to depart from this principle.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment, ECF No. 13, is **DENIED**, and Defendants' Cross-Motion for Summary Judgment, ECF No. 17, is **GRANTED**.

A separate Order will **ISSUE**.


　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　PETER J. MESSITTE
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

**March 28, 2019**